UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:14-80031-CR-MARRA/MATTHEWMAN

**UNITED STATES OF AMERICA,**

vs.

**CHRISTOPHER R. GLENN**
_____/

### DEFENDANT'S OBJECTIONS/RESPONSES
### TO PRESENTENCE INVESTIGATION REPORT

**COMES NOW**, defendant, **CHRISTOPHER R. GLENN**, (hereinafter "GLENN"), by and through his undersigned counsel, **PATRICK MCKAMEY, ESQUIRE,** and hereby files his Objections/Responses to the Presentence Investigation Report, (hereinafter "PSR").

1.  GLENN objects to Paragraph 8 of the PSR. In paragraph 8, it reports GLENN being hired around February 2012 by Harris Corporation to work as an information technology contractor. GLENN was actually hired in November 2011 while residing in Australia. GLENN's start date was February 1, 2012 at JTF-B in Honduras.

2.  GLENN objects to Paragraph 11 of the PSR, only insofar as to add supplemental facts to Paragraph 11. On July 30, 2012, computer security technicians arrived in order to scan GLENN's hard drive for malware, as it related to a July 19, 2012 incident. GLENN at the time had several hard drives he was working on and he was changing upwards of 5-10 hard drives per day, in order to test his reference image for one of his work projects. GLENN then gave the JTF-B computer security technician a hard drive, and then offered an additional hard drive, due to the fact that GLENN was unsure which hard drive out of the multiple ones he worked with, might have caused the potential malware incident.

3. GLENN objects to Paragraph 12 of the PSR. In Paragraph 12, it is alleged that GLENN misled JTF-B computer security technicians when "he failed to provide them with his true unclassified hard drive on July 30, 2012." GLENN maintains that he never misled JTF-B technicians as to his true unclassified hard drive. This paragraph fails to recognize that GLENN was given authority to make a forensic duplicate image (an exact copy) of his hard drive during the first malware incident on July 30, 2012. GLENN, at the time, was working on a complicated computer imaging project and pointed out to the technicians which hard drives he had been using most frequently. It was the job of the Information Assurance Department to know what serial number and what hard drive corresponded with the disc they were looking for at the time. The Information Assurance Dept. never told GLENN which specific hard drive they wanted, so GLENN provided all of his discs to them and they only took the last three he had been using for work.

4. GLENN objects to Paragraph 14 of the PSR, insofar as to add supplemental background facts which are noteworthy for the Court to consider in this matter. In Paragraph 14, it is alleged that the JTF-B Commander confirmed that he had never authorized GLENN or anyone else to take or copy either his entire SIPR email account or any document within it. Paragraph 14, however, fails to state all of the circumstances surrounding the backup of the SIPR PST file to the DVD-RW disc.

Earlier that week, between June 11, 2012 and June 15, 2012, a Harris NOC meeting was held wherein it was made clear by the J6 Director Captain Stacie Rembold, that the JTF-B Base Commander Colonel Ross Brown would be leaving permanently to transfer to Virginia, and that he would need his PST files and personal files backed up onto DVD. McCorl Jenkins from ADPE was to assist in the task but GLENN was also asked to assist in regards to the PST file

portion and encryption of the DVD discs.  It was not made clear if Colonel Brown needed only his NIPR emails and files backed up or his SIPR emails and files as well.

On June 15, 2012, GLENN was given the task of transferring Colonel Brown's contacts into the Blackberry phone for the new base commander, Colonel Guy Lemire.  This task was issued to GLENN without a ticket, by email, directly from the J6 Commander Stacie Rembold to Frank Henry.  Mr. Henry was the NOC supervisor and more specifically, GLENN's supervisor. Mr. Henry forwarded the task to GLENN. GLENN then replied with instructions on how Colonel Brown could do this task himself and received a reply from Captain Stacey Rembold that the instructions seemed satisfactory.

Later that day, Friday, June 15th in the evening, GLENN received a call from Raymie Soto whom explained that she didn't understand the instructions on how to transfer Colonel Brown's contacts from his PST file to Colonel Lamire's PST file.  She told GLENN that the Colonel was leaving Monday and reminded him about the backup task of the PST files and emails, as well as the encryption of the disc which all needed to be done by Monday morning.  GLENN asked if the contacts and PST files which needed to be worked on were only from the Commander's NIPR files/contacts or both NIPR and SIPR, to which she was unsure.  GLENN also called Colonel Brown's Honduran administrative assistant, Yamivel Hernandez, and she too, was unsure if anyone from ADPE had completed the backup task, and whether or not the Colonel needed both the NIPR and SIPR side contacts/emails transferred.

GLENN ultimately decided that in an abundance of caution, it was better to copy everything from Colonel Brown (both NIPR and SIPR) in case it was needed and to encrypt the dvds once he was done.  GLENN completed the backup task for Colonel Brown's NIPR PST dvd backup on Friday, June 15, 2012, and completed the backup of Colonel Brown's SIPR dvd on

Sunday, June 17, 2012 during an overtime work weekend and in the presence of every other technician in the office.

During the week of June 18- June 22, 2012, GLENN shredded what he believed to be Colonel Brown's SIPR secret email PST backup dvd, which in fact turned out to be the NIPR unclassified dvd.  Due to his own negligence in failing to label the dvd discs after copying them, he mistakenly shredded the wrong dvd and kept the unlabeled SIPR secret email PST backup dvd on his work desk station.  GLENN has maintained consistently since the indictment that he never intended to steal or convert Colonel Brown's PST files, email files, or email attachments as is alleged in Paragraph 14 of the PSR.  Rather, these items were merely copied incidental to him attempting to complete an assignment for which he was tasked by his supervisors.  He clearly, however, was negligent and reckless in failing to properly label and subsequently destroy the SIPR secret email PST backup dvd.  GLENN's guilt is evidenced by the act itself of computer intrusion and willful retention of classified material.  GLENN's intent is not at issue, given that the willful act itself of copying and retaining the classified material, makes him guilty in a strict liability sense.

5. GLENN objects to Paragraph 15 of the PSR.  Paragraph 15 suggests that there was something nefarious or unusual about what steps GLENN took to disable and override the system security protections in order to create the dvd disk.  In actuality, both Major Frank Henry (GLENN's supervisor) and Eddie Willis from the NOC have both stated that they were unaware of any policy that domain administrators working at the NOC at JTF-B in June/July 2012 were not authorized to copy or burn classified materials onto removable media.  The error message from the disk burning software was as common as all HBSS error messages, which prevented users from performing the most mundane and routine tasks at the NOC.  Frank Henry can also confirm

that HBSS blocked users from performing legitimate tasks and that domain administrators routinely disabled HBSS, in order to override system security protections as part of completing normal, perfunctory and basic administrative tasks.  GLENN was a domain administrator, and during his employment, was unaware of any policy that he was violating, by burning the dvd or by disabling the HBSS security software.  GLENN was operating under the premise that he had a legitimate backup task to perform for the Colonel, which he felt was well withing the scope of his employment.

6. GLENN objects to Paragraph 16 of the PSR.  In Paragraph 16, it is alleged that GLENN cleared the Windows event log files in an attempt to delete evidence of the steps he took to copy the JTF-B Commander's classified files.  This was not the case.  GLENN could have easily wiped the SIPR hard drive and re-imaged it with a new version of windows, if deleting evidence of his actions was truly his intent.  GLENN would have had the time and opportunity to do so between June 17, 2012 and August 6, 2012.  Not only was GLENN tasked with assisting to backup Colonel Brown's emails and documents to dvd and encrypt them, it is important to note that log files were set to "not circulate."  In other words, when log files would accumulate to the point that the hard drive of the computer terminal or server was full, the computer would begin to malfunction, respond abnormally slow, or potentially freeze or crash.  JTF-B provided no independent log server, and as a result, technicians would constantly have to delete log files when a computer was running slow or malfunctioning.  Considering the overwhelming amount of log data stored on the SIPR terminals, which were known as slow and cumbersome, GLENN would have had good reason to clear the event log files in preparation for the additional tasks they were going to perform that Sunday, June 17, 2012.

7. GLENN objects to Paragraph 18 of the PSR.  GLENN was on paid administrative

leave from Harris during this time, over what he was told was a malware incident. He withdrew the money to invest in his house, to explore business opportunities, and to prevent Harris from electronically revoking his pay, in the event that he was terminated for the malware incident.

8. GLENN objects to Paragraph 20 of the PSR. It is alleged in Paragraph 20 that "servers" were found by the Honduran police in GLENN's home pursuant to a search warrant being executed. It is GLENN's position that he did not own any servers in his home, therefore, no servers could have been seized by the authorities. It is also alleged in Paragraph 20 of the PSR that GLENN gave access to information contained in the Synology documents to at least two individuals. In actuality, GLENN created accounts for two other individuals to access his synology diskstation and download a computer windows operating system image GLENN was working on. Neither user was able to connect and access his synology diskstation, nor were they able to download the windows images. GLENN never transferred any classified or sensitive information to either of these two individuals or any other party.

9. GLENN objects to Paragraph 21 of the PSR. It is alleged in Paragraph 21 by the government that between March 2008 and January 2009, GLENN engaged in fraudulent or criminal acts while working as a consultant with an Iraqi company at Camp Bucca. GLENN denies these allegations for which he was never criminally charged.

While at Camp Bucca, Lt. Richard Packer authorized GLENN to have access to the Niprnet Network and provided GLENN with a government computer. Air Force Sgt. Ezra Akins provided GLENN with authorization to access certain government databases, and to assist in making changes to base privileges of Iraqi nationals. Sgt Akins further authorized GLENN to repair and backup the databases. Former Base Commander navy Captain Bruce Derenski wrote an affidavit stating that GLENN never defrauded the government, never stole goods or services,

nor did GLENN ever act in an unauthorized manner.

As it relates to the allegation in Paragraph 21 that GLENN attempted to "persuade others to make unauthorized changes to identification badges", he denies this assertion. GLENN further submits that any attempt to persuade others to make changes to ID badges, in order to allow unescorted access to Camp Bucca, was based on company management requests due to a shortage of staff that possessed an unescorted status on the base. The fact that GLENN made official requests while consulting at Camp Bucca regarding these changes, demonstrates that he was not trying to break the law or commit any type of fraud, but in fact attempting to receive legitimate authorization.

10.     GLENN objects to Paragraph 22 of the PSR. In Paragraph 22 of the PSR, it is alleged by the government that GLENN was engaged in some type of illegal activity or misconduct because he kept external hard drives and removable storage devices at his living quarters in FOB Bucca. When forensically examined, these files pertained to the badge networking system, various computer hacking software utilities, key logging software and remote network connection software.

GLENN submits that files related to the badge networking system were copied and maintained with authorization from Air Force Sgt. Atkins, whom approached GLENN and requested that he assist him with maintaining, repairing, and updating the broken and updated database. While this was not the official job duty of GLENN, he agreed to assist at the request of his employer, Saad Alsaad, whom GLENN worked for at the Al Barth Company. The Air Force had no official support for the "BAPPS" database and GLENN was providing support free of charge. The "computer hacking software utilities" and "key logging software and remote network connection software" which was found in GLENN's living quarters, were in fact security auditing

tools, as well as network monitoring tools, which he used to perform his job duties on the company private network for Al Barth Company.  GLENN maintains that he never used these utilities on the government NIPR Network.

GLENN was given these tasks by his boss, Saad Alsaad, who tasked him with monitoring the activities being performed by the Iraqi staff on base, dud to the sensitive nature of the work environment- a high security detainment facility.  Mr. Alsaad requested that GLENN secure the wired and wireless network, which was the reason he used the "computer hacking software utilities", which were in fact, utilities used to audit and secure company networks.  The purpose of remote monitoring and keylogging software is to supervise, monitor, and review the activities of the staff.  Moreover, the use of such software was to prevent against any inappropriate messages or actions being carried out which could jeopardize the Al Barth company contract or position with the various government agencies which operated the detention facility on base.

GLENN further objects to the allegations made by his ex-wife M.T.A. and submits that they are baseless.  After helping people with computer problems, GLENN would often maintain a copy or backup of the user data in the event the user requested that the data be restored at a future point in time.  The user data GLENN dealt with often included precious photos, word documents, books, and other unique work which could not be recreated or recovered if lost.  As part of a service to help someone wipe, erase, and re-image a computer infected by a virus, the technician is responsible to preserve the users valuable and irreplaceable data.  GLENN's ex-wife, M.T.A. made malicious accusations motivated by anger at GLENN over their divorce and that he chose to re-marry.  While it is true that GLENN kept large amounts of electronic records which he backed up for others during routine computer repair jobs and tasks, he did such backups only with the consent or authorization from the users whom he helped.  As in the instant case, there is no

evidence that GLENN used this information for any illegal purpose, or any purpose at all, for that matter.

11. GLENN objects to Paragraph 38 of the PSR identified as "Adjustment for Obstruction of Justice". GLENN maintains that he was forthright and honest during any and all debriefings conducted by the Government. GLENN has not be charged with any criminal offenses for intentionally misleading or making "numerous materially false statements" to the Government.

12. GLENN objects to Paragraph 39 of the PSR identified as "Adjustment for Obstruction of Justice". The implication in Paragraph 39, is that by disconnecting the "black box with blinking lights", GLENN was attempting to tamper with or destroy material evidence. This is not the case. The "black box with blinking lights" was understood by GLENN and Yarb Al-Ethary to refer to a malfunctioning UPS battery backup device which would beep or even smoke when overloaded by electrical current.

After being detained, GLENN was concerned that the faulty UPS battery backup device would catch fire in his home. The battery backup was located directly above a clothing wardrobe and GLENN didn't want it to cause a fire and hurt his wife Sinea in his absence, or destroy the house. The fact that the Synology diskstation was found plugged in and intact during the search of GLENN's home in Honduras, is evidence that neither Yarb nor Sinea ever disconnected the Synology diskstation. They in fact, disconnected the UPS battery backup which had blinking lights on its screen. Even if the Synology diskstation had been unplugged, this act in no way would have erased, damaged, or destroyed any evidence or files kept on the Synology diskstation. The best evidence to illustrate this point is the fact that all of the government's evidence regarding the Commander's emails/files was found intact on the Synology diskstation when it was seized.

Had it been GLENN's intent to destroy this evidence, he could have easily instructed Sinia to do so by getting rid of the Synology diskstation altogether.

13.     GLENN objects to Paragraph 40 of the PSR identified as "Adjustment for Obstruction of Justice."  The government alleges that, "subsequent to his guilty plea, the government learned that the defendant had plotted an escape from the Palm Beach County Jail with two other inmates."  First, GLENN categorically denies that he ever plotted to escape or attempted any escape plot from the Palm Beach County Jail.  This claim is absurd and patently false.  Additionally, GLENN was never charged with any criminal offenses for this alleged escape attempt.

GLENN further objects to Paragraph 40, regarding the governments claim that they learned of this plot *subsequent to his guilty plea.*  This representation is false.  This matter, in fact, was reported and investigated back in October of 2014 and GLENN was questioned about it during his debriefing on January 20, 2015.  GLENN denied any involvement in a plot to escape.  The plea conference went forward three (3) days later on January 23, 2015.

14.     GLENN objects to Paragraph 44 of the PSR identified as "Base Offense Level".  The government asserts that the guideline for 18 U.S.C. §§ 793(e) and 1030(a)(1) is found under 2M3.2 of the guidelines, and has a Base Offense Level of 30.  The correct guideline for Count I, which charges Unauthorized Possession and Willful Retention of National Defense Information, in violation of 18 U.S.C. §§ 793(e), should be under 2M3.3 of the guidelines, with a Base Offense Level of 24.  *See U.S. v Malki, 609 F.3d 503 (2nd Cir. 2010); U.S. v Aquino, 555 F.3d 124 (2009).*

15.     GLENN objects to Paragraph 47 of the PSR identified as "Adjustment for Role in the Offense."  The government asserts incorrectly, that the "defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or

concealment of the offense."  GLENN did not hold a professional, supervisory, or management position.  GLENN was a low-level employee who did not have any "special skills" or higher security clearance than those in the same position.   In fact, GLENN, if anything, was less qualified than many other system administrators that worked for Harris, given that GLENN was not even certified during the time he worked in Honduras.  Additionally, GLENN was closely supervised.  The Government, through it own negligence, allowed information to be accessed by not just by GLENN but all employees similarly situated.   GLENN did not have substantial discretionary judgment that was given considerable deference.  GLENN did not hold himself out to anyone as one having a significant position of power and trust.   Just because we trust a person to handle another's property in the course of their job, does not mean they occupy a "position of trust" for the purpose of a 3B1.3 enhancement.  *U.S. v. Ward*, 222 F.3d 909 (11th Cir. 2000).  Moreover,  GLENN did not possess and "special skill" or a skill not possessed by members of the general public.  GLENN did not hold any special licensing that would lend itself to a specialized "skill".

   This adjustment applies to persons who provide sufficient indicia to the victim that they legitimately hold a position of public or private trust, when in fact, they do not.  For the enhancement to apply, the relationship between the defendant and the victim must be more significant than that of an arm's-length business transaction.  *U.S. v. Garrison*, 133 F.3d 831 (11th Cir. 1998).

   This adjustment does not apply where the United States is the relevant "victim", as GLENN did not occupy or abuse a position of trust with respect to the government.  *U.S. v. Harness*, 180 F.3d 1232, (11th Cir. 1999).   In fact, there is no identifiable "victim" at all.  Here, as the PSR states in Paragraphs 37 (Victim Impact) and 52 (Victim Related Adjustment), there is no

identifiable victim.

  16. GLENN objects to Paragraph 48 of the PSR identified as "Adjustment for Obstruction of Justice." GLENN did not willfully obstruct or imped or attempt to obstruct or imped the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction.

  17. GLENN objects to Paragraph 49 of the PSR identified as "Adjusted Offense Level (Subtotal):   GLENN believes the Subtotal should be 30, nor 34.

  18. GLENN objects to Paragraph 56 of the PSR identified as "Multiple Count Adjustment". GLENN believes the Adjusted Offense Level should be 30, nor 34.

  19. GLENN objects to Paragraph 57 of the PSR identified as "Greater of the Adjusted Offense Levels Above." GLENN believes the Level should be 30, not 34.

  20. GLENN objects to Paragraph 58 of the PSR identified as "Combined Adjusted Offense Level". GLENN believes the Level should be 30, not 34.

  21. GLENN objects to Paragraph 61 of the PSR identified as "Acceptance of Responsibility". GLENN made a timely Acceptance of Responsibility and timely notified authorities of his intention to enter a plea, thereby permitting the government to avoid preparing for trial. By nature of entering a plea on January 23, 2015, GLENN further allowed the government and the court to allocate their resources efficiently. GLENN availed himself to the Government for numerous debriefings. GLENN should not be denied this reduction because the Government simply did not like some of his answers during the debriefings. GLENN should not be denied this reduction due to an alleged attempt to unplug the "blinking black box", which was no more than a UPS battery backup that contained no data at all on it. This item, once unplugged in no way could alter, erase, or destroy any of the data/files on the Synology diskstation. The

Synology diskstation was recovered by the Government, in tact, and had not in any way been erased, altered, destroyed or removed from GLENN's premises.  Had GLENN wanted to Obstruct Justice, he would have advised Sinia to destroy the Synology diskstation, rather than simply turn it off.  GLENN was never charged with any criminal offense for the alleged plotting to attempt to escape.

22.     GLENN objects to Paragraph 62 of the PSR identified as "Total Offense Level".  GLENN believes the Total Offense Level should be 28.

23.     GLENN objects to Paragraph 66 of the PSR identified as "Other Criminal Conduct".  It is alleged in Paragraph 66 by the government that between March 2008 and January 2009, GLENN engaged in fraudulent or criminal acts while working as a consultant with an Iraqi company at Camp Bucca.  GLENN denies these allegations for which he was never criminally charged.

While at Camp Bucca, Lt. Richard Packer authorized GLENN to have access to the Niprnet Network and provided GLENN with a government computer.  Air Force Sgt. Ezra Akins provided GLENN with authorization to access certain government databases, and to assist in making changes to base privileges of Iraqi nationals.  Sgt Akins further authorized GLENN to repair and backup the databases.  Former Base Commander navy Captain Bruce Derenski wrote an affidavit stating that GLENN never defrauded the government, never stole goods or services, nor did GLENN ever act in an unauthorized manner.

As it relates to the allegation in Paragraph 66 that GLENN attempted to "persuade others to make unauthorized changes to identification badges", he denies this assertion.  GLENN further submits that any attempt to persuade others to make changes to ID badges, in order to allow unescorted access to Camp Bucca, was based on company management requests due to a shortage

of staff that possessed an unescorted status on the base. The fact that GLENN made official requests while consulting at Camp Bucca regarding these changes, demonstrates that he was not trying to break the law or commit any type of fraud, but in fact attempting to receive legitimate authorization.

24. GLENN objects to Paragraph 67of the PSR identified as "Other Criminal Conduct." In Paragraph 67, the government alleges that GLENN was involved in sexual exploitation with minors in Honduras. GLENN strongly objects to these allegations and denies ever being sexually involved with minors. Additionally, GLENN has not been criminally charged with any offense related to sexual misconduct with minors, and accordingly, would object to any weight being given to these allegations.

25. GLENN objects to Paragraph 73 of the PSR identified as "Personal and Family Data." In Paragraph 73, it is suggested that GLENN holds a belief that "he can marry multiple wives under the Islamic religion." GLENN has never contended, nor does he blelieve that he can marry multiple wives under Islamic religion.

26. GLENN objects to Paragraph 76 of the PSR identified under "Personal and Family Data." In Paragraph 76, it is alleged by Khadraa Glenn that they separated in February 2013. They actually physically separated in December of 2011 when GLENN went to work in Honduras and the last time they lived as husband and wife was December 2011.

27. GLENN objects to Paragraph 81 of the PSR identified as "Substance Abuse." It is alleged in Paragraph 81 that GLENN drank alcohol daily, from the time he was 12 years of age up until the time of his arrest. While it is true that he tried alcohol for the first time when he was 12 years of age, he began abusing alcohol only after losing his job in Honduras with Harris. GLENN has a substance abuse problem both with alcohol and pain pills (vicodin).

28.     GLENN objects to Paragraph 99 of the PSR identified as "Analysis." It is alleged in Paragraph 99 that GLENN "may have assets that are held in foreign countries." GLENN maintains that he currently has no assets held in foreign countries. In addition, the government hasn't seized or frozen any assets, either in or outside of the United States.

29.     GLENN objects to Paragraph 101 of the PSR identified as "Guideline Provisions". GLENN believes the total offense Level should be 28. With a Criminal history category of I, the guideline imprisonment range is 78-97 months.

30.     GLENN objects to Paragraph 105 of the PSR identified as "Guideline Provisions". If the Total Offense Level is 28, the applicable guideline range is in Zone D of the sentencing Table.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 1st day of July, 2015, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List in the manner specified, wither via transmission of Notices of Electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic filing.

Respectfully Submitted,

PATRICK R. McKAMEY, ESQ.
Perlet, Shiner & McKamey, P.A.
Attorney for the Defendant
Northbridge Centre
515 North Flagler Drive, Suite 701
West Palm Beach, Florida 33401
(561) 721-0552 telephone
( 561) 721-3049 facsimile

By: _s/Patrick R. McKamey, Esquire_
     Patrick R. McKamey, Esq.
     Florida Bar No. 0103624